Filed 10/21/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVION KEEL,<br><br>    Defendant and Appellant. | D079181<br><br>(Super. Ct. No. FSB051307) |

APPEAL from an order of the Superior Court of San Bernardino, Cara D. Hutson, Judge. Reversed and remanded with instructions.

Kimberley J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

In 2005, fifteen-year-old Davion Keel and eighteen-year-old Ariel Bolton held Barry Knight at gunpoint and robbed him of twenty dollars on the streets of San Bernardino.  One of them shot and killed Knight when he resisted the robbery and tried to flee.  Keel and Bolton were both prosecuted in adult criminal court and convicted of first degree murder in connection with Knight's death.

More than a decade later, Keel filed a petition to vacate his murder conviction and to be resentenced under Penal Code section 1172.6 based on recent legislative changes to our state's murder laws.  (Further undesignated statutory references are to the Penal Code.)[1]  The trial court denied the petition for resentencing, finding Keel was not entitled to relief because he remained liable for Knight's murder under a still-valid theory of liability—to wit, he was a major participant in the underlying robbery and he acted with reckless indifference to human life.

Keel appeals the order denying his petition for resentencing.  He argues the evidence was insufficient to support the trial court's finding that he was a major participant in the underlying robbery who acted with reckless indifference to human life.  In the alternative, he contends the court applied an incorrect legal standard when it adjudicated his petition for resentencing.

We agree with Keel's first argument, which renders it unnecessary for us to reach his second argument.  Because there was insufficient evidence to

---

[1]     At the time Keel filed his petition for resentencing, section 1170.95 governed the resentencing of murder convictions.  Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).  We will refer to the statute in its renumbered form.

support the trial court's determination, we reverse the order denying Keel's resentencing petition and remand the matter to the trial court with directions to grant Keel's resentencing petition and vacate his murder conviction.

Further, we conclude Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Cal. Const., art. I, § 32), and Senate Bill 1391 (2017–2018 Reg. Sess.) will apply retroactively to Keel once his petition for resentencing is granted and his murder conviction is vacated. Therefore, on remand, we instruct the trial court to transfer the matter to the juvenile court for resentencing in accordance with these measures.

## II

## BACKGROUND

A. *Procedural History*

In 2008, a jury convicted Keel of the first degree murder of Knight (§§ 187, subd. (a), 189). Keel was sentenced to 25 years to life in prison. Our court affirmed the conviction on direct appeal. (*People v. Bolton* (Oct. 8, 2009, D055691) [nonpub. opn.].) The Supreme Court denied review on January 13, 2010.

In 2019, Keel filed a petition to vacate his murder conviction and to be resentenced based on legislative amendments that significantly curtailed the scope of our state's felony-murder rule. He alleged he could not be convicted of murder if he were tried for the crime today because: (1) he was not the actual killer; (2) he did not aid and abet the actual killer with the intent to kill; and (3) he was not a major participant in the underlying robbery and he did not act with reckless indifference to human life.

The trial court initially declared the resentencing statute, section 1172.6, unconstitutional, and it struck the resentencing petition for that reason. However, on appeal, our court concluded section 1172.6 is

3

constitutional.  (*People v. Keel* (May 21, 2020, D075827) [nonpub. opn.].)
Thus, we reversed the order striking the petition and remanded the matter
for further proceedings.  (*Ibid.*)  On remand, the trial court found that Keel
made a prima facia showing of entitlement to relief and set the matter for an
evidentiary hearing.

B. *Prosecution Evidence*

The prosecution made three alternative claims why Keel could still be
convicted of murder, notwithstanding the legislative changes to our state's
felony-murder rule:  (1) he was the actual killer; (2) he aided and abetted the
actual killer with the intent to kill; or (3) he was a major participant in the
robbery and he acted with reckless indifference to human life.  To support
these arguments, the prosecution submitted the information charging Keel
with Knight's murder; reporter's transcripts from the murder trial showing
the testimony of several percipient witnesses; the jury instructions and
verdicts from the murder trial; and our opinion affirming Keel's conviction.
The prosecution's evidence told the following story.

Early one morning, Barry Knight and Deantre Conner were walking
the streets of downtown San Bernardino looking for drugs.  They encountered
fifteen-year-old Keel and eighteen-year-old Bolton, both of whom Conner
believed were members of the East Side Crips street gang.  Knight and
Conner approached Keel and Bolton in the hope of buying drugs.

Knight said that he and Conner had twenty dollars to buy drugs.
Bolton asked which one of them had the money and Knight said he had it.  At
some point, Keel and Bolton both produced firearms and held them at their
sides.  Keel was armed with a silver revolver and Bolton was armed with a
black MAC-10 semiautomatic firearm.

4

According to Conner, Keel mentioned "two previous confrontations" that had taken place between Conner and Keel. The details of these confrontations are not entirely clear from the record. However, Conner testified that Keel went through his pockets and performed a "shake down" of him during the prior encounters. After referencing these prior encounters, Keel accused Conner of "shit" talking and said, "he could really take [Conner] out right now if he wanted to." But he did not. Instead, he told Conner to "leave" and "get out of here."

Conner started to walk away when he overheard Keel and Bolton tell Knight to empty his pockets. Conner turned around and saw Bolton conduct a pat down search of Knight. He also saw Keel and Bolton point their guns at Knight. While this was going on, Knight said that all he had was twenty dollars. Conner continued walking and told Knight to give Keel and Bolton what they wanted—i.e., to give them the twenty dollars.

Before Conner reached the end of the city block, he heard four or five gunshots behind him. He did not see who fired the shots, but he saw Knight running away and heard him say, "Oh my God. Oh my God." Keel and Bolton fled in a different direction.

A bystander about a block away saw Keel point his gun at Knight and identified him as the shooter, although his view of Bolton was obstructed and he did not see flashes from the muzzle of Keel's gun. A second bystander on a balcony about 100 feet from the shooting reported that he saw Keel push Knight during the encounter. However, he identified Bolton as the shooter.

Law enforcement later recovered several .9 millimeter shell casings from the crime scene. The shell casings came from the same firearm and the firing pin impressions were consistent with a MAC-10 firearm—the gun that Bolton was carrying.

5

Conner and one of the bystanders followed Knight and caught up with him at a nearby motel. A police sergeant arrived soon after and found Knight lying on the ground. Knight died from a single gunshot wound to the chest.

About twelve hours after the shooting, police officers in a marked vehicle observed Keel and a few other persons loitering in a shopping center near the crime scene. They pulled into the shopping center and the loiterers fled. Keel ran into a nearby business and tried to hide his revolver in a trash can, but he was apprehended and the officers recovered the revolver. It was not loaded. Law enforcement later learned the revolver had been used by a gang member to commit a different murder a few weeks earlier.

C. *Defense Evidence*

Keel testified at the evidentiary hearing. He was 15 years old when he and Bolton robbed Knight at gunpoint. At the time, he was an associate—but not a member—of the East Side Crips street gang. As a young gang associate, he sold drugs and alerted older gang members when police were in the area.

Keel testified he met Bolton when he was six or seven years old. Keel lived with one of Bolton's family members and Bolton sometimes came to the house for a day or two at a time. Keel moved out of the home after a year or a year and a half, and Bolton moved away as well, so Keel did not see Bolton again until about two weeks before Knight's killing. He testified Bolton was in the same gang as him and Bolton's family members were "real killers," but Bolton did not have a reputation as a menace or a killer.

Keel admitted he had a gun with him the morning of the shooting. He testified an older gang member gave him the gun and told him to throw it in a lake, but he kept it instead. According to Keel, the gun was not loaded.

6

Keel testified that Bolton came to him the morning of the shooting and asked him to "hit the block," meaning he wanted to hang out on the street, wait for "older homies," and possibly sell drugs. Keel agreed to "hit the block" with Bolton. He knew Bolton was armed with a firearm, but he denied knowing the firearm was loaded.

When Keel and Bolton encountered Knight and Conner, Bolton asked who had the money and Knight said he had the money. Keel testified that Bolton and Knight stepped aside at that point while he and Conner remained where they were.

Keel testified he looked over and saw that Bolton had his gun pulled out, which "shocked" and "surprised" him. By then, he knew Bolton was robbing Knight. Keel pulled out his firearm, reminded Conner about an "incident" from a few weeks earlier, and told him to walk away. Meanwhile, Bolton searched Knight, tried to grab a money bag from him, and then shot him as he resisted. Keel said he was "shocked," "scared," and "surprised" when Bolton fired his gun. Keel testified he did not think Knight had even been shot because he was able to run away from the scene of the robbery.

The defense also submitted a transcript of the trial testimony from a witness who was incarcerated in the same cell block as Bolton. According to the witness, Bolton said he "shot a dude when he was running," and he took twenty dollars from him. Bolton also asked the witness to kill both Conner and the bystander who had identified Bolton as the shooter.

D. *The Denial of the Petition for Resentencing*

At the conclusion of the evidentiary hearing, the court found there was "no credible evidence" that Keel shot Knight. Although one bystander identified Keel as the shooter, the court found the bystander's credibility on this issue was "dubious at best." Therefore, the court rejected the

7

prosecution's theory that Keel was ineligible for resentencing because he was the actual killer.

However, the court opined that it faced a far more "difficult" decision with regard to whether Keel was a major participant in the robbery who acted with reckless indifference to human life. The court acknowledged, on the one hand, that Keel was "a mere 15 years old" at the time of the robbery, "the decision to rob was made quickly," and the events culminating in the shooting "unfold[ed] rather quickly"—factors that would seem to indicate that Keel was not a major participant and/or did not act with reckless indifference to human life. The court noted, on the other hand, that Keel pulled out a firearm and pointed it at Knight during the robbery, which suggested he was a major participant who acted with the mental state of reckless indifference.

After articulating these competing factors, the court ultimately found Keel was a major participant in the underlying robbery and he acted with reckless indifference to human life. Based on these findings, the court denied Keel's petition for resentencing.

## III

## DISCUSSION

A. *Senate Bill 1437*

"In 2017, the Legislature adopted a concurrent resolution declaring a need to reform the state's homicide law 'to more equitably sentence offenders in accordance with their involvement in the crime.' [Citation.] The next year, the Legislature followed through with Senate Bill 1437, which made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory." (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*).)

8

"As relevant here, Senate Bill 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.]  Penal Code section 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2' — that is, the statute defining the felony-murder special circumstance.  (*Id.*, § 189, subd. (e)(3).)"  (*Strong, supra*, 13 Cal.5th at p. 708.)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended.  [Citations.]  Under newly enacted section 1172.6, the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met (*id.*, subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*Strong, supra*, 13 Cal.5th at p. 708, fn. omitted.)

"When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for

9

relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' " (*Strong, supra*, 13 Cal.5th at p. 708.)

Unless the parties stipulate that the defendant is eligible for resentencing, the court must "hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).)" (*Strong, supra*, 13 Cal.5th at p. 709.) At the hearing, the court may consider previously-admitted evidence, so long as it remains "admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) The parties "may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

B. *Substantial Evidence Did Not Support the Trial Court's Finding That Keel Acted with Reckless Indifference to Human Life*

The trial court found Keel was ineligible for resentencing because he remained "guilty of murder," notwithstanding the Legislature's curtailing of our state's felony-murder rule. (§ 1172.6, subd. (d)(3).) In particular, it found he could still be convicted of first-degree felony murder because he was a

10

major participant in the underlying robbery and he acted with reckless indifference to human life. (See § 189, subd. (e)(3).)

Keel argues there was insufficient evidence to support the court's major participation and reckless indifference findings. To assess whether sufficient evidence supported these findings, we apply the substantial evidence standard of review. (*People v. Nieber* (2022) 82 Cal.App.5th 458; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747.) "Under this standard, ' "we review the entire record in the light most favorable to the [challenged order] to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Nieber*, at p. 476.)

To borrow a phrase from the trial court, the evidence in this case required the court to make a "difficult decision." Some considerations pointed to one outcome, while other considerations arguably pointed to the opposite outcome. Further, we are mindful that the substantial evidence standard of review is a deferential one, which often results in an affirmance of the judgment or order rendered by the trial court. Nonetheless, on the record before us, we cannot discern sufficient evidence to support the trial court's determination that 15-year-old Davion Keel acted with the requisite mental

11

state of reckless indifference to human life.  For that reason, the order denying the petition for resentencing must be reversed.[2]

### 1. Reckless Indifference Standard

Under the current version of our state's murder laws, a non-killer may be convicted of first-degree felony murder if he or she:  (1) was a major participant in a statutorily-enumerated felony in which a death occurs, and (2) acted with reckless indifference to human life.  (§ 189, subd. (e)(3).)

"Reckless indifference to human life has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." '  [Citation.]  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a 'grave risk of death" ' satisfies the statutory requirement.  [Citation.]  Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force

---

2    Because the evidence was insufficient to support a finding that Keel acted with reckless indifference to human life, we do not assess Keel's claim that there was not enough evidence to prove he was a major participant in the underlying robbery.  We also do not reach Keel's contention that the trial court applied the wrong legal standard when it adjudicated his petition for resentencing.

might be used' is not sufficient to establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the Supreme Court provided important guidance on the meaning of reckless indifference to human life. According to *Clark*, reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) *Clark* set forth a non-exhaustive list of factors pertinent to decide whether a defendant acts with reckless indifference to human life, including the defendant's use of, or awareness of, the presence of a weapon or weapons; the defendant's physical presence at the crime scene and opportunity to restrain confederates or aid victims; the duration of the crime; the defendant's knowledge of any threat the confederates might represent; and efforts taken by the defendant to minimize risks. (*Id.* at pp. 618–623.) " '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' "[3] (*Id.* at p. 618.)

Since *Clark*, courts have discerned an additional factor that may be relevant to the reckless indifference analysis—the defendant's youth. "It is well recognized that '[c]hildren "generally are less mature and responsible than adults" ' and ' "often lack the experience, perspective, and judgment to

---

[3] *Clark* articulated these factors while interpreting section 190.2, the special-circumstance statute. That statute makes a defendant eligible for death or life in prison without the possibility of parole if he or she is a "major participant" in an enumerated felony resulting in death, and he or she acts "with reckless indifference to human life." (§ 190.2, subd. (d).) When the Legislature enacted Senate Bill 1437, it incorporated these same elements into section 189. (*Strong, supra*, 63 Cal.4th at p. 274.) In doing so, it "codified the understanding of those requirements" as elucidated in *Clark* and *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). (*Strong,* at p. 710.)

recognize and avoid choices that could be detrimental to them" ....' [Citation.] As a result, '[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.' [Citation.] This is so 'even where a "reasonable person" standard otherwise applies ....' " (*In re Moore* (2021) 68 Cal.App.5th 434, 453 (*Moore*).)

We agree youth can be a relevant consideration—potentially an important one, depending on the facts of the case—bearing on whether a juvenile defendant acted with reckless indifference to human life. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990–991 (*Ramirez*) [reversing order denying petition to resentence murder conviction, in part, because petitioner's "youth at the time of the shooting greatly diminishe[d] any inference he acted with reckless disregard for human life"]; *Moore, supra*, 68 Cal.App.5th at pp. 454, 455 [vacating robbery-murder special circumstance finding based, in part, on petitioner's "youth at the time of his offenses"]; see also *In re Harper* (2022) 76 Cal.App.5th 450, 466, fn. 8 ["youth would appear to be an obvious consideration when determining whether a defendant acted with reckless indifference to human life"]; accord *People v. Harris* (2021) 60 Cal.App.5th 939, 960 [defendant's youth was relevant to whether he was a major participant in underlying felony].)

### 2. Application

Viewing the appellate record in the light most favorable to the order denying Keel's petition for resentencing, we conclude substantial evidence did not support the trial court's finding of reckless indifference to human life, as that statutory term has been interpreted in *Clark* and subsequent case law.

The first *Clark* factor—the defendant's use of, or awareness of, the presence of a weapon or weapons—only slightly supported the trial court's

14

finding of reckless indifference.  (*Clark, supra*, 63 Cal.4th at pp. 618–619.)  It was undisputed that Keel carried a revolver during the encounter with Knight and he knew Bolton had a firearm as well.  Further, there was some disputed testimony that Keel pointed his revolver at Knight during the robbery.  This evidence would seem to suggest Keel was culpable.

On the other hand, there was no evidence that Keel provided Bolton with his firearm.  There was no evidence that Keel instructed Bolton to fire his weapon either.  (See *Ramirez, supra*, 71 Cal.App.5th at pp. 975, 988 [juvenile defendant did not act with reckless indifference to human life, in part, because he did not provide murder weapon or instruct his confederate to shoot].)  For his part, Keel testified that he did not learn that Bolton had a firearm until after they had already left to "hit the block."  Keel also denied any prior knowledge that Bolton's gun had bullets in it.  There was no evidence to the contrary, and the People do not argue on appeal that Keel knew Bolton's gun was loaded with ammunition.

Further, there was no direct evidence that Keel's revolver was loaded.  Indeed, the evidence in the record suggests otherwise.  When law enforcement recovered Keel's revolver the day of the shooting, there were no bullets in it.  Keel's possession of a possibly-unloaded revolver, and his awareness that Bolton had a firearm, do not give rise to a particularly strong inference of culpability.[4]  (See *Clark, supra*, 63 Cal.4th at p. 618 ["The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life."].)

---

[4]    The trial court opined that it was "not convinced" Keel's revolver was unloaded because it had been used by a different gang member to perpetrate a homicide two weeks earlier.  In our view, it is unreasonable to infer that a firearm was loaded based solely on the fact that a different person fired a bullet from the firearm two weeks earlier.

15

The second *Clark* factor—the defendant's presence at the crime scene and opportunity to restrain confederates or aid victims—is neutral. On the one hand, Keel was present at the scene of the shooting, which allowed him to observe Bolton's actions and ostensibly gave him at least some chance to act as a moderating force. Regrettably, Keel did not do so.

However, as the trial court explained, "[t]he decision to rob was made quickly," and Bolton's decision to shoot was apparently made even more quickly in response to Knight's unexpected resistance and efforts to flee. Given the spontaneity of the robbery in general, and of Bolton's conduct in particular, we are not persuaded Keel had a meaningful opportunity to restrain Bolton or intervene before he shot Knight. (See *Scoggins, supra*, 9 Cal.5th at p. 679 [petitioner lacked control over his confederates' actions, "given how quickly the shooting occurred"]; *Moore, supra*, 68 Cal.App.5th at p. 452 ["The short duration of the robbery and the sudden and unprovoked nature of the shooting" reinforced the conclusion that petitioner could not restrain his confederate's actions].)

The third *Clark* factor—the duration of the crime—significantly reduces Keel's culpability. In *Clark*, the Supreme Court explained that "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.) Thus, in assessing a defendant's mental state, "[c]ourts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant." (*Ibid.*)

Here, there was no evidence the robbery was prearranged. By all accounts, the encounter was unexpected and unplanned. In fact, Keel and Conner both testified that Knight initiated the encounter—not Keel or

Bolton. As the trial court observed, this was "a quick crime of opportunity," and Keel had "no idea" it would happen.

Further, events unfurled in rapid succession once the encounter began. According to Conner, the two sides had a brief exchange during which Bolton asked who had the drug money and Keel told Conner to walk away. As Conner walked away, Bolton conducted a pat down and Knight resisted. According to Conner, he had not even walked to the end of the city block before shots erupted. This "evidence tended to show that the shooting was a 'somewhat impulsive' response to the victim's unexpected resistance, as opposed to the culmination of a prolonged interaction that increased the opportunity for violence." (*In re Taylor* (2019) 34 Cal.App.5th 543, 558; see also *Scoggins, supra*, 9 Cal.5th at p. 681 [third *Clark* "factor [did] not weigh in favor of finding that [petitioner] exhibited reckless indifference to human life" because the confederate and the victim "had only a brief conversation before [the confederate] pulled out a gun and shot" the victim].)

The fourth *Clark* factor—the defendant's knowledge of any threat his confederate might represent—also reduces Keel's culpability. There was no evidence that Bolton exhibited any previous violent tendencies or had a reputation for violence. Nor was there any evidence that Keel had knowledge of any possible violent behaviors or tendencies on Bolton's part. Keel was the only witness who testified about his relationship with Bolton, and he stated he had not seen Keel for many years until just two weeks before the shooting. Further, he testified that Bolton did not have a reputation as a menace or a killer. The paucity of evidence that Bolton had a propensity to commit violent acts, as well as the lack of evidence that Keel was aware of any such propensity, undermines the notion that Keel acted with reckless indifference

17

to human life.[5] (*Clark, supra*, 63 Cal.4th at p. 621 [petitioner did not act with reckless indifference to human life, in part, because "no evidence was presented at trial that [the confederate] was known to have a propensity for violence, let alone evidence indicating that defendant was aware of such a propensity"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 [finding " 'significant' " the lack of evidence that the petitioner knew of his confederates' "violent propensities"].)

Neither party addresses the fifth *Clark* factor—that is, the defendant's efforts to minimize risks—at any length. (*Clark, supra*, 63 Cal.4th at pp. 621–622.) Keel surely escalated the risk of violence when he pulled out his revolver. But he arguably minimized the risk of violence by telling Conner—a potential victim who could have been hurt during the encounter—to leave the scene.

In addition to the factors enumerated in *Clark*, Keel's youth bears significantly on his culpability. Keel was a mere 15 years old when Bolton shot Knight. "[T]he ' "hallmark features" ' of youth include ' "immaturity, impetuosity, and failure to appreciate risks and consequences." ' [Citations.] ' "[T]he background and mental and emotional development of a youthful defendant [must] be duly considered" in assessing his culpability.' [Citation.] '[T]hey "are more vulnerable or susceptible to ... outside pressures" than

---

5      The People contend Keel was "no stranger to his accomplice or the criminal activities of his gang." (fn. omitted.) To the extent the People suggest Keel should have been aware of Bolton's violent tendencies based solely on his association with the East Coast Crips street gang, we are not persuaded. The Supreme Court has "caution[ed] against relying too heavily on gang membership where there is no evidence *the defendant or his confederates* 'had ever participated in shootings, murder, or attempted murder.' " (*Ramirez, supra*, 71 Cal.App.5th at p. 990 [quoting *Banks, supra*, 61 Cal.4th at pp. 810–811], italics added.) As noted, there was no evidence Bolton personally participated in violent acts prior to the shooting.

adults ....' " (*Ramirez, supra*, 71 Cal.App.5th at p. 991.) Keel's "youth at the time of the shooting greatly diminishes any inference he acted with reckless disregard for human life" during the armed robbery. (*Id.* at p. 990.)

Further, there was evidence suggesting Keel's youth may have rendered him especially vulnerable to outside pressures. Keel associated with the East Side Crips street gang when he was just six or seven years old. He received a moniker ("Baby Ready") at the tender age of six from a gang member that, in Keel's words, he considered to be a "father figure." According to Keel, there was an expectation among gang members that younger gang associates would "instantly go do" their bidding. Given this expectation, it is reasonable to infer Keel would have felt pressure to "hit the block" and go along with the robbery instigated by Bolton—a fellow gang associate who was three years Keel's senior.

In sum, the evidence showed 15-year-old Davion Keel participated in a crime of opportunity in which a death occurred. The crime was unplanned, spontaneous, and short in duration. There was no direct evidence that Keel carried a loaded weapon during the crime. There was no evidence that he knew his confederate's weapon was loaded. There also was no evidence that Keel supplied his confederate with a weapon or instructed him to use one. There was no evidence that his confederate had a propensity or reputation for violence, let alone that Keel was aware of such violent tendencies. Further, when these tragic events unfurled, Keel was a 15-year-old minor—a member of a class of persons who, in general, " 'have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1375, quoting *Miller v. Alabama* (2012) 567 U.S. 460, 471.)

On this record, we cannot conclude that Keel " 'knowingly creat[ed] a "grave risk of death," ' " such that he may be found to have acted with reckless indifference to human life. (*Scoggins, supra*, 9 Cal.5th at p. 683.) Because there was insufficient evidence that Keel acted with reckless indifference to human life, the prosecution failed to carry its burden of proving, beyond a reasonable doubt, that Keel remains "guilty of murder" under our state's current murder laws. (§ 1172.6, subd. (d)(3).) The petition for resentencing must therefore be granted.

C. *The Case Must Be Transferred to the Juvenile Court for Resentencing*

Keel argues his case must be transferred on remand to the juvenile court pursuant to Proposition 57 and Senate Bill 1391. We agree.

Keel perpetrated the robbery at issue in 2005. At the time, "in specified circumstances, prosecutors were permitted, and sometimes required, to file charges against a juvenile directly in criminal court, where the juvenile would be treated as an adult." (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 305 (*Lara*).) Consistent with the laws that were in effect, Keel was tried for Knight's murder in adult criminal court.

In 2016, California voters approved Proposition 57, which "requires prosecutors to commence all cases involving a minor in juvenile court." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 87 (*O.G.*); see *Lara, supra*, 4 Cal.5th at p. 303 [Proposition 57 "prohibits prosecutors from charging juveniles with crimes directly in adult court"].) Although the measure required charges against minors to be filed in juvenile court, it still granted prosecutors some discretion to seek transfers to adult criminal court for 14 and 15-year old defendants who were accused of specified serious or violent offenses. (*O.G.,* at p. 89 [citing former Welf. & Inst. Code, § 707, subd. (a)(1), as amended by Prop. 57, § 4.2].)

20

In 2018, the Legislature enacted Senate Bill 1391, which "eliminat[ed] the transfer of juveniles accused of committing crimes when they are 14 or 15 years old, unless they are first apprehended after the end of juvenile court jurisdiction." (*O.G., supra*, 11 Cal.5th at p. 89.)  Thus, as general matter, "individuals who were under 16 years of age when they committed any criminal violation … may no longer be transferred to adult/criminal court at all." (*People v. Castillero* (2019) 33 Cal.App.5th 393, 399.)

"The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Lara, supra*, 4 Cal.5th at p. 303.)  By giving a neutral judge the power to decide whether a case will be heard in juvenile court, rather than vesting such authority with a district attorney charged with the duty to act as a zealous advocate, Proposition 57 "ameliorated the possible punishment for a class of persons, namely juveniles." (*Id.* at p. 308.)  Because the measure was an ameliorative change to the criminal law, courts have inferred the voters intended it " 'to extend as broadly as possible.' " (*Id.* at p. 309.)  Thus, Proposition 57 retroactively "applies to all juveniles charged directly in adult court whose judgment was not final at the time it was enacted." (*Id.* at pp. 303–304; see *People v. Hwang* (2021) 60 Cal.App.5th 358, 365 (*Hwang*) ["if defendant's judgment was not final when Proposition 57 was enacted, he is entitled to the retroactive application of that proposition"].)

"Senate Bill 1391 is likewise an ameliorative change to the criminal justice system that emphasizes rehabilitation over punishment and serves the broader purpose of decarceration." (*O.G., supra*, 11 Cal.5th at p. 101.) "Like Proposition 57, Senate Bill 1391 focuses on rehabilitation by increasing the number of juveniles adjudicated in juvenile court and decreasing the

number of juveniles tried in criminal court." (*Ibid.*; see *Hwang, supra,* 60 Cal.App.5th at p. 365 ["Senate Bill [ ] 1391 effectively broadens the ameliorative benefit of Proposition 57 to 14- and 15-year-olds by prohibiting prosecuting attorneys from moving to transfer individuals who commit certain offenses when they were 14 or 15 years old to adult court"].) Similar to Proposition 57, Senate Bill 1391 "applies retroactively to defendants whose judgments are not yet final." (*Hwang,* at p. 365; see *People v. Superior Court (I.R.)* (2019) 38 Cal.App.5th 383, 392–393 [Senate Bill 1393 applies retroactively to juveniles with nonfinal judgments].)

The question remains whether Proposition 57 and Senate Bill 1391 will apply retroactively to Keel, who was just 15 years old when the robbery occurred, but whose judgment became final in 2010 (before Proposition 57 or Senate Bill 1391 went into effect). Keel argues they will apply retroactively to him. The People do not contend otherwise—a telling silence. We agree with Keel the measures apply retroactively to him because his judgment will no longer be final once the trial court vacates his murder conviction.

Under section 1172.6, a defendant who succeeds on a resentencing petition is entitled to "vacat[ur] [of] the murder … conviction and to recall [of] the sentence and resentenc[ing] … on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1); see also *id.,* subd. (d)(3) ["If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."].) Thus, on remand, Keel will be entitled to vacatur of his murder conviction, recall of his sentence, and resentencing as though he had not previously been sentenced.

22

In short, Keel's judgment will no longer be final once the trial court grants his petition for resentencing and vacates his murder conviction. Because it will no longer be final, Keel will be entitled to the retroactive application of Proposition 57 and Senate Bill 1391. (*Ramirez, supra,* 71 Cal.App.5th at pp. 996–1000 [Proposition 57 and Senate Bill 1391 applied retroactively to petitioner who obtained vacatur of first degree murder conviction and resentencing under section 1172.6, even though petitioner's judgment was previously final]; see *People v. Padilla* (2022) 13 Cal.5th 152, 158 [Proposition 57 applied retroactively during resentencing of petitioner whose previously-final sentence was vacated in habeas corpus proceeding].)

Those measures generally preclude the transfer of any individuals who were 15 years of age or younger when they committed a crime. Keel was 15 years of age when he perpetrated the robbery of Knight. Thus, on remand, the matter must be transferred to juvenile court, which "shall treat [Keel's] remaining conviction[] as [a] juvenile adjudication[] and impose an appropriate disposition." (*Ramirez, supra*, 71 Cal.App.5th at p. 1000.)

IV

DISPOSITION

The order denying Keel's petition for resentencing is reversed. The matter is remanded to the trial court with instructions to grant the petition for resentencing, vacate Keel's murder conviction, and transfer the matter to the juvenile court. The juvenile court is instructed to treat Keel's remaining conviction as a juvenile adjudication and to impose an appropriate disposition.

McCONNELL, P. J.

WE CONCUR:

AARON, J.

DATO, J.

24